UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

**UNITED STATES OF AMERICA,**

   **Plaintiff,**

**v.**

**JOHN M. SEMBER,**

   **Defendant.**

Case No. 3:14-cr-141

Judge Thomas M. Rose

---

**ENTRY AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION TO SUPPRESS (DOC. 62)**

---

This case is before the Court on the Motion to Suppress (Doc. 62) filed by Defendant John M. Sember, by which he seeks to suppress evidence seized from his residence on March 28, 2014, pursuant to a search warrant. On January 26, 2016, the Court held a hearing on the Motion to Suppress, and the parties have submitted post-hearing memoranda based on the testimony and other evidence admitted at the hearing. (Docs. 75, 78-79, 81-82, 83.) For the reasons stated below, the Motion to Suppress is **GRANTED IN PART** and **DENIED IN PART**.

## I.  BACKGROUND[1]

Sember has been indicted for knowingly, intentionally and without proper authority stealing certain sensitive and proprietary technical, engineering and computer data and codes belonging to the United States Air Force and having a value in excess of $1,000, in violation of 18 U.S.C. § 641. (Doc. 27.) Sember's Trial is scheduled for March 28, 2016.

In or around early 2013, Sember became an employee of Booz-Allen Hamilton

---

[1] The facts in this section are provided for background purposes only and do not constitute findings of fact by the Court. Any findings necessary to the Court's ruling are contained in the Analysis section *infra* at Part III.

Engineering Services ("BAHES"), a Department of Defense contractor with contracts with the United States Air Force ("Air Force"). (Ex. A, ¶ 6-7.) Sember was the lead electrical engineer on a project called the "LEAP" program at the Air Force Research Laboratory's Center for Rapid Product Development ("CRPD"). (*Id.* at ¶ 6-7, 10.) On March 14, 2014, Sember's employment on the LEAP program was terminated. (*Id*. at ¶ 12.) On March 18, 2014, Sember returned to his employer two laptop computers and one external hard drive, which he had used in working on the LEAP program. (*Id.* at ¶ 10, 16.) On March 21, 2014, Sember told the Booz-Allen Hamilton human resources and legal departments that he had destroyed all of the data on the computers and external hard-drive. (*Id.*) Vincent Parisi, a U.S. Government employee and Chief at the CRPD, served as Sember's non-BAHES supervisor. (*Id.* at ¶ 8.) Both Parisi and Bernard Bosma, one of Sember's co-workers on the LEAP program, believed that Sember had not destroyed the data, but likely had it stored on a home computer. (*Id*. at ¶ 20-21.)

Andrew J. Eilerman, Special Agent of the Federal Bureau of Investigation ("FBI"), conducted interviews of Parisi, Bosma, and Karen Paulsen, the Facility Security Officer for BAHES, regarding Sember's termination. (*Id.* at ¶ 6, 8, 18.) Based on his investigation, Eilerman then applied for a warrant to search Sember's residence for the data that he erased from his computer equipment. Eilerman's affidavit supporting the application summarized his investigation into Sember's possible violations of 18 U.S.C. § 1832(a)(2) (theft of trade secrets) and 18 U.S.C. § 641 (theft of United States Government property). (*Id.*) On March 27, 2014, Magistrate Judge Michael R. Merz reviewed Eilerman's application and supporting affidavit and issued the search warrant. (Exs. A, W.)

On March 28, 2014, the FBI executed the search warrant at Sember's residence located at 1979 Centralia Avenue in Fairborn, Ohio. (Doc. 75 at PAGEID# 634.) The FBI seized a total of

44 items during the search, many of which were electronic media. (Doc. 75 at PAGEID# 647.)

On September 25, 2014, the Government filed the original Indictment in this case. (Doc. 3.) On November 12, 2014, Sember brought a motion to suppress the evidence obtained from the search of his residence. (Doc. 14.) On January 16, 2015, the Court held a hearing on the Motion to Suppress, after which the parties submitted post-hearing memoranda. (Docs. 18-21.) On April 1, 2015, the Court denied the motion to suppress. (Doc. 22.) On April 14, 2015, the Government filed the Superseding Indictment—which is the current indictment. (Doc. 27.)

On September 22, 2015, Sember's attorney moved to withdraw from the case due to a conflict of interest that would arise if a member of his law firm were called to testify as a witness. (Doc. 43.) After a hearing, the Court granted the motion to withdraw; and shortly thereafter, on October 6, 2015, Sember's current counsel filed his notice of appearance. (Doc. 46.)

On December 11, 2015, Sember's current counsel filed the Motion to Suppress that is now before the Court. (Doc. 62) While the Motion to Suppress raises some of the same issues that the Court addressed in considering the motion to suppress filed by Sember's former counsel, it also contains additional arguments that were not previously raised. On January 26, 2016, the Court held a hearing on the Motion to Suppress. (Doc. 75.) After the hearing, Sember submitted a post-hearing memorandum in support of the Motion to Suppress (Docs. 78-79), the Government submitted a response to Sember's memorandum (Doc. 81), and Sember submitted a reply (Doc. 83.) The Motion to Suppress is fully briefed and ripe for the Court's review.

## II.     LEGAL STANDARD

The Fourth Amendment to the United States Constitution protects the rights of individuals against unreasonable searches and seizures. *United States v. Ganias*, 755 F.3d 125, 133 (6th Cir. 2014). A search occurs when the Government acquires information by either "physically

intruding on persons, houses, papers, or effects" or otherwise invades an area in which the individual has a reasonable expectation of privacy. *Id*. (citing *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013)). "A seizure occurs when the Government interferes in some meaningful way with the individual's possession of property." *Id*. (citing *United States v. Jones*, 132 S. Ct. 945 n.5 (2012)). The party seeking suppression of evidence obtained by a search has the burden of proving that the search was unlawful. *United States v. Blakeney*, 942 F.2d 1001, 1015 (6th Cir. 1991).

A search warrant will issue only if "(1) the Government establishes probable cause to believe the search will uncover evidence of a specific crime; and (2) the warrant states with particularity the areas to be searched and the items to be seized." *Ganias*, 755 F.3d at 134. Probable cause "is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). "Finely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision [whether to issue a warrant]. While an effort to fix some general, numerically precise degree of certainty corresponding to 'probable cause' may not be helpful, it is clear that 'only the probability, and not a *prima facie* showing, of criminal activity is the standard of probable cause.'" *Gates*, 462 U.S. at 235 (quoting *Spinelli, supra,* 393 U.S. at 419).

"The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for conclud[ing] that probable

4

cause existed.'" *Gates*, 462 U.S. at 238-39 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). "The ultimate touchstone of the Fourth Amendment is reasonableness." *Ganias*, 755 F.3d at 134 (citing *Missouri v. McNeely*, 133 S. Ct. 1552, 1569 (2013)).

When a search or seizure violates the Fourth Amendment, the Government may be precluded from using the evidence obtained under the exclusionary rule. *Ganias*, 755 F.3d at 136. The suppression of evidence, however, is not an automatic consequence of a Fourth Amendment violation. *Herring v. United States*, 555 U.S. 135, 137 (2009). The suppression of evidence under the exclusionary rule applies only where it would result in "appreciable deterrence" of Fourth Amendment violations in the future. *Id.* at 141 (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)). "To the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against its substantial social costs," the principal cost being "letting guilty and possibly dangerous defendants go free." *Id.* (internal brackets and quotation marks omitted) (quoting, in part, *Illinois v. Krull*, 480 U.S. 340, 352–353 (1987)). The exclusionary rule therefore applies only when the police conduct is "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id*. at 144. The Supreme Court has interpreted such conduct to include "deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Id.*

Inclusion of a false statement in the affidavit supporting an application for a search warrant may trigger application of the exclusionary rule. *Franks v. Delaware*, 438 U.S. 154, 155 (1978). For the exclusionary rule to apply in such circumstances, a defendant must establish, by a preponderance of the evidence, "that the false statement was included in the affidavit by the affiant knowingly and intentionally, or with reckless disregard for the truth, and the false statement was

5

necessary to the finding of probable cause." *Id.* Pursuant to *Herring*, the exclusionary rule would also apply where gross negligence is responsible for the inclusion of such a false statement. 555 U.S. at 144.

The Government has raised two exceptions to the exclusionary rule: the "inevitable discovery" exception and the "good faith" exception. The inevitable discovery exception provides that evidence obtained through an illegal search should not be excluded "[i]f the prosecution can establish by a preponderance of the evidence that the information (or evidence) ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 476 U.S. 431, 444 (1984). To determine if this exception applies, the Court must place the Government and the accused "in the same positions they would have been in had the impermissible conduct not taken place." *Id.* at 447. "[I]f the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police, there is no rational basis to keep that evidence from the jury in order to ensure the fairness of the trial proceedings." *Id.*

Under the good faith exception, the exclusionary rule does not bar admission of evidence seized in reasonable, good faith reliance on a search warrant later found to be defective. *United States v. Higgins*, 557 F.3d 381, 391 (6th Cir. 2009) (citing *United States v. Rice*, 478 F.3d 704, 711-12 (6th Cir. 2007)). The good faith exception does not apply in four situations:

> (1) where the issuing magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth;
>
> (2) where the issuing magistrate wholly abandoned his judicial role and failed to act in a neutral and detached fashion, serving merely as a rubber stamp for the police;
>
> (3) where the affidavit was nothing more than a "bare bones" affidavit that did not provide the magistrate with a substantial basis for determining the existence of probable cause, or where the affidavit was so lacking in indicia of probable cause as

to render official belief in its existence entirely unreasonable; and

(4) where the officer's reliance on the warrant was not in good faith or objectively reasonable, such as where the warrant is facially deficient.

*Rice*, 478 U.S. at 711-12.

### III.   ANALYSIS

Sember argues that the evidence obtained from the search of his home should be suppressed for the following reasons:

A. Eilerman swore in his affidavit that classified materials were likely to be found at Sember's residence, but Sember did not possess any classified materials and Eilerman knew that the CRPD, where Sember had been working, is "unclassified and that work done at the facility is also unclassified" (Doc 78 at 5-6 (quoting Ex. E));

B. Eilerman attributed certain statements in his affidavit to Vincent Parisi, but those statements are not contained in the memorandum memorializing Eilerman's interviews of Parisi (Doc. 78 at 9-12);

C. Eilerman swore in his affidavit that Ben Bosma said that Sember likely had copies of the data that he worked on while working at the CRPD stored on his home computer, but that statement is not contained in the memorandum memorializing Eilerman's interview of Bosma (Doc. 78 at 13-14);

D. Eilerman swore in his affidavit that Claude Nicol, a CRPD Information Technology employee, reviewed Sember's computer equipment and determined that all of the data had been erased, but Eilerman did not speak with Nicol before drafting the affidavit and the FBI's review of the equipment thirteen months later showed that the returned hard drive could not be accessed due to a hardware failure and hundreds of thousands of files existed on the other returned equipment (Doc. 78 at 14-18); and

E. The warrant failed to particularly describe the things to be seized, and therefore constituted a general search in violation of the Fourth Amendment (Doc. 78 at 18-26).[2]

---

[2] In the Motion to Suppress memorandum filed December 11, 2015 (Doc. 62), Sember argued that Eilerman was reckless in his description of Sember's post-termination attempts to access the facility where LEAP program equipment is maintained. (Doc. 62 at 17-18.) Sember did not make this argument in the memorandum that he submitted after the *Franks* hearing; the Court therefore deems it abandoned. In his post-hearing memorandum, Sember also asserted that Eilerman was not prepared to testify at the *Franks* hearing and, as a result, his testimony was reckless as to the truth of certain facts relevant to his application

7

The Court addresses each of these arguments in turn below.

### A. The Presence of Classified Materials in Sember's Residence

Sember first argues that the evidence obtained from the search of his residence should be suppressed because Eilerman made false statements in his supporting affidavit regarding Sember's likely possession of classified materials. (Doc. 78 at 5 (citing *Franks*, 438 U.S. 154).) This argument fails because, even if Eilerman made any false statements regarding the presence of classified materials with the requisite culpability, those statements were not necessary to the finding of probable cause.

In his affidavit, Eilerman stated that he was investigating Sember for possible violations of 18 U.S.C. § 1832(a)(2) (theft of trade secrets) and 18 U.S.C. § 641 (theft of United States Government property). Section 1832(a)(2) states, in pertinent part:

> (a) Whoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly –
>
> (2) without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information;
>
> shall [. . .] be fined under this title or imprisoned not more than 10 years, or both.

18 U.S.C. § 1832(a)(2). The term "trade secret" means:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if--

---

for a search warrant. (Doc. 78 at 26.) Sember failed to tie this assertion to a discernible argument regarding what impact, if any, Eilerman's testimony at the *Franks* hearing should have on the search conducted nearly two years earlier. Moreover, as noted elsewhere in this Order, the Court found Eilerman's testimony at the *Franks* hearing to be credible.

>    (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
>    (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public[.]

18 U.S.C. § 1839(3)(A)-(B). Information therefore does not have to be designated as "classified" to constitute a trade secret, so long as it derives independent economic value from "not being generally known to, and not being readily ascertainable through proper means by, the public." 18 U.S.C. § 1839(3)(B).

>    Section 641, regarding the theft of Government property, states:
>
>    Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or
>
>    Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—
>
>    Shall be fined under this title or imprisoned not more than ten years, or both; but if the value of such property in the aggregate, combining amounts from all the counts for which the defendant is convicted in a single case, does not exceed the sum of $1,000, he shall be fined under this title or imprisoned not more than one year, or both.

18 U.S.C. § 641. Likewise, materials do not have to be designated as "classified" to constitute Government property within the of scope of Section 641.

Even when Eilerman's statements regarding classified information are excluded from his affidavit, the magistrate judge still had a substantial basis to find probable cause that evidence of a violation of Section 1832(a)(2) or Section 641 would be found at Sember's residence. The facts supporting the finding of probable cause include that: (1) Sember performed the bulk of the circuitry and wiring related to the LEAP program while he was employed by BAHES, which

9

included the development of intellectual property; (2) any computer-generated work product would have been stored on one of two laptops or an external hard drive purchased with U.S. Government funds and issued to Sember by BAHES; (3) the contract between the U.S. Government and BAHES "explicitly provides that any and all data derived from [the LEAP] project belongs to either the U.S. Government or BAHES;" (4) Sember signed a Non-Disclosure Agreement as part of his employment with BAHES, in which he agreed (a) not to disclose or appropriate for his own use any information regarding the LEAP program unless specifically authorized to do so, and (b) to safeguard and protect sensitive, proprietary and classified information; (5) Sember was terminated from his employment on the LEAP program and subsequently returned the computer equipment issued to him; (6) Vincent Parisi, a U.S. Government employee and Sember's non-BAHES supervisor, believed that Sember had deleted all of the LEAP program data from the computer equipment that he returned; (7) Bernard Bosma, one of Sember's co-workers at BAHES, worked on the LEAP program with Sember "day in and day out" and believed that Sember would not have destroyed data representing 1,000 to 2,000 hours of labor and research, but would likely have retained a copy of it on his home computer; and (8) Parisi indicated "that it is extremely unlikely for an engineer working on a project such as the LEAP project and numerous previous projects, to just destroy all data compiled during their tenure" and therefore it was probable that Sember "has the information stored somewhere."[3] (Ex. A, ¶ 8, 10-11, 16-21.)

Eilerman's statements regarding the classified nature of certain data may have lent an air of urgency to the application for a search warrant, but they were not necessary to the magistrate judge's finding of probable cause. As a result, Sember is not entitled to suppression of any

---

[3] Sember's argument that some of these facts are unsupported by the record and therefore false is addressed below.

evidence on the basis of the inclusion of such statements in Eilerman's affidavit.

    **B.**    **Statements Attributed to Vincent Parisi**

Sember argues that his motion to suppress should be granted because Eilerman was reckless or grossly negligent in attributing the following statements in his affidavit to Vincent Parisi:

> 1) "Parisi explained that because Sember was the lead electrical engineer on this program, Sember did the bulk of the circuitry and wiring related to the program."
>
> 2) "According to Parisi, any and all computer-generated work would have been stored on either Sember's BAHES laptop or on Sember's LEAP project laptop and likely backed up to an external hard-drive."
>
> 3) "All three of these items were solely in Sember's possession."
>
> 4) "Parisi expressed concern because Sember frequently took his computers home at the conclusion of the work day."
>
> 5) "It was further described to your affiant by both Parisi and Paulsen that U.S. Government contract money provided to BAHES purchased the aforementioned three items."
>
> 6) "These three items are considered BAHES property, and all data on the computers and external hard-drive are considered proprietary U.S. Government property."

(Doc. 78 at 11-12 (quoting Ex. A, ¶ 10).) The memorandum memorializing Eilerman's March 27, 2014 interview of Parisi (Ex. K), during which Eilerman gathered a substantial portion of the information in his affidavit, does not contain any of the above statements. (Doc. 78 at 11-12.) Sember reasons that, because the above statements are not in the memorandum, Parisi must not have made those statements to Eilerman; the statements are therefore false; and Eilerman was reckless or grossly negligent as to their falsity when he included them in his affidavit. (*Id.*)

This argument fails because Sember has not proven, by a preponderance of the evidence, either that the statements attributed to Parisi are false or that Eilerman included those statements in

11

his affidavit with the requisite culpability. Sember's argument hinges exclusively on the information contained in (or missing from) Eilerman's memorandum. The mere absence of information in Eilerman's memorandum, however, does not establish that the statements in Eilerman's affidavit were false or that Eilerman was reckless or grossly negligent as to their truth.

Eilerman testified at the *Franks* hearing that he called Parisi on March 25, 2014, and held a formal, in-person interview with him on March 27, 2014. (Doc. 75 at PAGEID# 572.) Eilerman did not create a memorandum memorializing his March 25th phone call, but did create a memorandum following the March 27th interview. (*Id.* at PAGEID# 570-72.) Eilerman's interview memorandum incorporated his notes and his recollection of what Parisi had told him. (*Id.* at PAGEID# 573.) Eilerman conceded that the specific information contained in the statements now challenged by Sember cannot be found in his interview memorandum. (*Id.* at PAGEID# 573-75.) However, Eilerman also explained that interview memoranda "are not a dictation of conversations held between myself and the interviewee." (Doc. 75 at PAGEID# 574.) On cross-examination by the Government, Eilerman affirmed that the facts contained in his affidavit were "true and accurate to the best of [his] knowledge" when he drafted the application for a search warrant. (*Id.* at PAGEID# 626-27.)

Eilerman's testimony at the *Franks* hearing was credible and his explanation for the information missing from his affidavit is plausible. Parisi was not called to testify at the *Franks* hearing, and there is no other evidence showing that he did not provide the information attributed to him in Eilerman's affidavit. For these reasons, Sember fails to show both the falsity and requisite intent required to justify the suppression of evidence under *Franks*.

### C.    Statements Attributed to Bernard Bosma

Similar to the above argument relating to Parisi, Sember argues that Eilerman was reckless

or grossly negligent in attributing a statement in his affidavit to Bosma, one of Sember's co-workers on the LEAP program. Specifically, Sember argues that Bosma's statement that Sember was likely to have copies of his LEAP program data on his home computer (Ex. A, ¶ 20) must be false because that statement does not appear anywhere in Eilerman's Bosma interview memorandum. (Doc. 78 at 13-14.) This argument fails because Sember has not shown, by a preponderance of the evidence, either that this statement was false or that Eilerman acted with the requisite culpability when he included it in his affidavit.

Eilerman conceded that neither his Bosma interview memorandum nor his raw notes from that interview contain Bosma's statement that the data is likely on Sember's home computer. (Doc. 75 at PAGEID# 597-99.) Eilerman nonetheless maintained the accuracy of his affidavit and noted that both his interview memorandum and raw notes included discussion of what to expect if the FBI went to Sember's house. (*Id.* at PAGEID# 598-99.) Eilerman's argument, albeit implicit, is that he and Bosma would not have discussed going to Sember's house if Bosma had not told Eilerman that he would likely find the LEAP program data there. The Court already noted that Eilerman's testimony at the *Franks* hearing was credible. His logic here is persuasive and further supports that finding. Bosma was not called as a witness at the *Franks* hearing, and there is no other evidence showing that he did not make the statement attributed to him in Eilerman's affidavit.

As Sember has not demonstrated falsity or the requisite intent, the argument that the motion to suppress should be granted based on Bosma's statement fails.

    **D.**    **Claude Nicol's Review of Returned Equipment**

Sember argues that Eilerman was reckless or grossly negligent in making the following statement in his affidavit:

> On or about 03/18/2014, Sember returned his laptop computers and external hard-drive to a CRPD Information Technology employee named Claude Nicol. *After reviewing all of the equipment, Nicol determined that there were no data files anywhere on the equipment*.

(Ex. A, ¶ 16 (emphasis added).)

Eilerman testified that he never met and did not speak with Nicol before seeking the search warrant. (Doc. 75 at PAGEID# 590.) Instead, Eilerman testified that "Mr. Parisi would be the only one who could have told me that information." (*Id.* at PAGEID# 592.) Eilerman explained that Parisi must have told him the information because the paragraph about Nicol in his affidavit follows paragraphs containing information that he received from Parisi. (*Id.*) That explanation is not compelling because the paragraphs clearly attributed to Parisi (¶¶ 10-12) do not immediately precede paragraph 16. Other evidence, however, supports the conclusion that Parisi told Eilerman that Nicol reviewed and did not find any data on the returned equipment.

On April 13, 2015, Nicol told Eilerman that, on March 17, 2014 (the Monday after Sember was notified of his termination), Nicol and Sember went shooting at a firing range, after which:

> Sember then provided Nicol with two laptop computers and an external hard drive. According to Nicol, Sember stated: "Nothing is on these". Sember did not tell him what was supposed to be on the computers, nor did he tell him when or why he removed data from the computers/hard drive.
>
> The following day Nicol reviewed the contents of the external hard drive. Nicol recalled that the external hard drive didn't contain any data or information. Nicol turned the computers over to Vince Parisi and was unsure what he did with the two computers and external hard drive from there.

(Ex. L.) In another interview on August 10, 2015, Nicol added that he had "looked at one of the laptops, which had an operating system and program files, but in Sember's file there were no project files." (Ex. J. )

During an April 9, 2015 interview, Parisi's statements were consistent with Nicol's recollection. (Ex. J.) The memorandum from Parisi's April 9, 2015 interview states:

14

> Parisi believed that the computers were transferred from Sember to Claude Nichol [sic] shortly after Sember was terminated. He couldn't recall what was all on the computers but believed that they contained some email and other data but they were unable to locate the sensitive LEAP data.

(*Id.*) In light of the memoranda from these interviews, it is reasonable to conclude that Nicol provided Sember's returned equipment to Parisi. Parisi was therefore privy to the results of Nicol's limited review of that equipment and is the likely source of the statements in Eilerman's affidavit about that review.

Sember disputes not just the source of the information, however, but specifically the statement that Nicol reviewed "all of the equipment" and determined that there were "no data files anywhere on the equipment." Nicol's interview memoranda confirm that he did not review "all of the equipment," as stated in Eilerman's affidavit. At most, Nicol reviewed one laptop and the external hard drive, which means that he did not review one of the laptops that Sember returned. (Exs. L, J.) Consequently, Eilerman's statement that Nicol determined there were "no data files anywhere on the equipment" is demonstrably false. Nicol himself even said that there were operating system and program files on the one laptop that he reviewed. (Ex. J.) Sember further points to the results of the FBI's examination of the returned equipment, which found that one hard drive could not be imaged due to a device hardware failure, another piece of equipment contained 326,574 files, and the remaining piece of equipment contained 729,623 files. (Ex. P.)

Even though, with the benefit of hindsight, the statements in paragraph 16 of Eilerman's affidavit are not entirely accurate, the evidence does not support a finding that Eilerman was reckless or grossly negligent as to the truth of those statements when they were made. Eilerman reasonably relied on the information that he received from Parisi, who was the Chief of the CRPD and Sember's supervisor—someone entrusted with a leadership position at the relevant Air Force facility and in a position to know the circumstances surrounding Sember's termination. Eilerman

also obtained independent corroboration of Parisi's belief that there were no data files on the returned equipment through interviews with Karen Paulsen, the Facility Security Officer for BAHES.  *See Gates*, 462 U.S. at 241-42 (recognizing the "value of corroboration of details of an informant's tip by independent police work" when evaluating a probable cause determination). Paulsen told Eilerman, as summarized in Eilerman's affidavit, that:

> On 03/21/2014, Booz-Allen Hamilton (BAH) human resources and legal departments spoke telephonically with Sember.  During the call, Sember admitted that he destroyed all data on his issued computers to include the external hard-drive.  Sember informed BAH personnel that this was common practice in his experience with the United States Air Force.  Later in the same telephone call, Sember said something to the effect of:  "If they don't need me then they don't need my data."

(Ex. A, ¶ 17; *see also* Exs. D, E.)   Thus, at the time that Eilerman drafted his affidavit, he had a reasonable basis to believe that Sember had deleted all of the data, or at least all of the data relevant to the LEAP program, from his Government issued laptop computers and hard drive.

### E.     Particularity of Search Warrant

Sember argues that the search violated the Fourth Amendment's requirement that warrants "particularly describ[e] . . . the persons or things to be seized" (U.S. Const. amend. IV), which protects against a "general, exploratory rummaging in a person's belongings."  *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971).  Sember asserts that the FBI's search amounted to a generalized search of his property, and therefore the fruits of the search should be suppressed.

Sember first observes that the FBI seized a three-ring binder from the back seat of a GMC truck parked in his driveway (Ex. Q), despite the fact that Attachment A to the search warrant limited the scope of the search to only his residence.   The Government does not concede that the search of the truck was improper, but represents that it "has no intention of offering into evidence at trial any items seized from either defendant's parked truck or shed."  (Doc. 81 at 16.)   The

16

Government argues that this issue is therefore moot.  In any event, Sember's argument has merit. The Government will be barred from offering into evidence at trial any items seized from outside Sember's residence.

Sember next argues that the search of Sember's house exceeded the scope of the warrant because none of the electronic media seized by the FBI contained classified materials.[4]  Sember asserts that Attachment B to the search warrant limited the items to be searched and seized to only (a) electronic media containing classified material, documents and/or files, and (b) hard-copy documents that may contain U.S. Government or BAHES proprietary information.  (Ex. W, Attachment B.)

The Court addressed this identical argument in ruling on the motion to suppress brought by Sember's original counsel in this case.  (Doc. 22.)  There, the Court found that the warrant "arguably authorized the seizure of information that was not classified" because it referred to both classified and merely proprietary information as the objects of the search.  (*Id.* at 10.)  In addition, the Court held:

> Even if the Search Warrant did not authorize the seizure of non-classified information, items not specifically described in a search warrant may nevertheless be seized if they are "reasonably related" to the offenses which form the basis for the search warrant.  [*United States v. Wright*, 343 F.3d 849, 863 (6th Cir. 2003).] In this case, the offenses which formed the basis for the Search Warrant were the suspected theft of U.S. Government property in violation of 18 U.S.C. § 641 and the suspected conversion of U.S. Government and DOD contractor owned trade secrets in violation of 18 U.S.C. § 1832(a)(2).  And, Sember offers no argument or evidence that the items seized where not reasonably related to these offenses. Thus, Sember has not satisfied his burden of showing that the scope of the Search Warrant was exceeded by the removal of information that was not classified.

(*Id.*)  As the Court's previous ruling remains valid, no further elaboration is required here.

---

[4] Sember also incorporates by reference his argument, addressed *supra* at Part III.A., that Eilerman lacked probable cause to obtain the warrant because he had no reason to believe that there were any classified materials in Sember's home.

## IV. CONCLUSION

The Court rules on Sember's Motion to Suppress (Doc. 62) as follows:

- The Government is **BARRED** from offering into evidence at trial any items seized from the truck or shed outside of Sember's house during the FBI's March 28, 2014 search; and

- The Motion to Suppress is **DENIED** in all other respects.

**DONE** and **ORDERED** in Dayton, Ohio, this Wednesday, March 16, 2016.

s/Thomas M. Rose

--------------------------------------

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE